(December 4, 2003)

SRM CARD SHOP, INC., Respondent, v 1740 BROADWAY ASSOCIATES, L.P., Appellant, and HALLMARK SPECIALTY RETAIL GROUP, INC., Respondent. (And Another Action.) [769 NYS2d 483]—

Order, Supreme Court, New York County (Marilyn Shafer, J.), entered July 15, 2002, which granted summary judgment in these two consolidated cases to SRM Card Shop, Inc. (SRM) and to Hallmark Specialty Retail Group, Inc. (Hallmark), declaring that neither SRM nor Hallmark is obligated to pay rent arrears or future rent for the premises leased from 1740 Broadway Associates, L.P. (Associates); dismissing defendant-appellant's claims for rent arrears against SRM and Hallmark; and declaring that Hallmark is entitled to recover attorneys' fees from appellant, unanimously reversed, on the law, without costs, summary judgment granted to appellant, the complaint dismissed, and the matter remanded for an assessment of landlord's damages.

On October 18, 1988, Evenson Card Shops, Inc., which is now known as Hallmark Specialty Retail Group, Inc., and the Mutual Life Insurance Company of New York (MONY) entered into a 15-year lease (the Hallmark Lease or Lease), pursuant to which Hallmark leased 3,360 square feet of retail space and 365 square feet of adjacent storage space in a building located at 1740 Broadway in New York City. It was understood from the beginning of the Hallmark Lease negotiations, that Hallmark planned to sublease the entire space to SRM, which it did pursuant to a sublease agreement dated October 21, 1988 (the Sublease). Hallmark provided MONY with a copy of the Sublease and requested that the landlord send all rent invoices directly to SRM but specified that all legal notices be sent to Hallmark at their corporate headquarters in Kansas City, Missouri. In conformance with that request, rent invoices were sent to SRM, which paid the rent directly to the landlord, and all legal notices were sent to Hallmark. In 1990, Hallmark and MONY entered into a First and Second Amendment to the Lease, both of which were negotiated and executed by Hallmark.

In December 1990, MONY sold the building to Associates, which assumed the Hallmark Lease. SRM continued to pay rent directly to Associates, as it had to MONY, and legal notices continued to be sent to Hallmark.

In April 1996, David Sims, a vice-president of Mendik Management Co. (Mendik), Associates' managing agent for 1740 Broadway, met with Scott Mirsky, the president of SRM, and requested that the 365 feet of storage space provided for under the Hallmark Lease be exchanged for a noncontiguous space in the building's basement. Sims explained that Associates needed the Hallmark storage space in order to provide parking space for MONY, which remained the anchor tenant in the building. No one from Mendik or Associates contacted Hallmark with re-

spect to the proposed exchange of space. SRM asserts that it received a commitment from Sims that, in exchange for the substitution of space, Associates would waive or reduce the rent increase scheduled to take effect in December 1998 under the Hallmark Lease. SRM orally agreed to the space substitution, which then took place. Associates thereafter rented the original storage space to MONY. Associates denies that it ever agreed to forgo or reduce the December 1998 increase. No written modification to the Lease reflecting the exchange of space was executed.

In January 1997, about eight months after the storage space exchange was effectuated and nearly two years before the rent was scheduled to increase, Hallmark, at the request of Associates and as provided under the Hallmark Lease, executed an estoppel certificate. SRM also signed the certificate. As defined by the Lease, the estoppel certificate was "intended . . . [to] be relied upon by any prospective assignee of the Building, any mortgages [sic] or prospective mortgagees thereof, or any prospective assignee of any mortgagee thereof or any purchaser of the Building or an interest therein." Paragraph 7 of the estoppel certificate states that Hallmark and SRM claimed "no offsets, setoffs, rebates, concession, abatements, 'free' rent or defenses against or with respect to fixed or minimum rent, escalation rent, additional rent or other sums payable under the terms of the Lease . . . ." Paragraph 8 provides that "to the best knowledge of [Hallmark and SRM], neither the landlord nor the undersigned is in default" of their obligations under the Lease. Paragraph 13 states that the estoppel certificate constitutes tenant's waiver of any claims "to the extent that the claims are based on facts contrary to those asserted in this estoppel certificate and to the extent the claims are asserted against lender as a bona fide encumbrancer for value . . . ."

In December 1998, Associates implemented the scheduled rent increase, which SRM refused to pay, citing the commitment it had allegedly received from Sims that Associates would waive or reduce the rent increase. Approximately a year and a half later, Associates sent a demand for unpaid rent to Hallmark.

SRM then commenced an action in Supreme Court against Associates and Hallmark, seeking a declaration that the Hallmark Lease and the SRM sublease had been modified by the substitution of space and Associates' alleged oral agreement to forgo the December 1998 rent increase; reformation of the Hallmark Lease; or an order that Associates be directed to restore the original storage space to Hallmark. Hallmark cross-claimed for a declaration that Associates had breached the

Hallmark Lease by taking the storage space without Hallmark's consent or, alternatively, that the Hallmark Lease had been modified by the oral agreement between Associates and SRM. Associates then commenced a nonpayment proceeding in Civil Court seeking Hallmark's and SRM's eviction and payment of $193,481 in rental arrears arising primarily from the December 1998 increase, which had never been paid. In its response to Associates' petition, Hallmark asserted a number of affirmative defenses, including the defense of partial actual eviction from its leasehold space; counterclaims against Associates for a declaration that the Hallmark Lease had been modified, and for damages for breach of contract; and a cross claim against SRM for indemnification. The declaratory judgment and nonpayment cases were consolidated in Supreme Court.

Associates moved for summary judgment on its claim for rental arrears and attorneys' fees and for dismissal of SRM's complaint and Hallmark's counterclaims and cross claims against Associates. Hallmark also moved for summary judgment on its actual partial eviction defense to Associates' nonpayment of rent claim, as well as for a judgment that Hallmark owed no unpaid back rent nor any future rent until Associates restored the storage space provided for under the Hallmark Lease.

Supreme Court found that Hallmark had been actually partially evicted from the storage space provided under the Hallmark lease and granted Hallmark's motion to the extent of dismissing Associates' rent arrears claims, declaring that Hallmark and SRM were not obligated to pay any rental arrears or future rent until the space was restored to Hallmark or the parties reached a mutually agreeable settlement, and awarding Hallmark attorneys' fees in accordance with the terms of the Hallmark Lease.

On appeal, Associates argues that Supreme Court erred in finding a partial actual eviction because Mirsky had apparent authority to agree to the substitution of the space, because Hallmark knew of and acquiesced in the substitution and because of that Hallmark's execution of the estoppel certificate precludes it from asserting the defense of partial actual eviction.

To succeed on a motion for summary judgment, a movant must establish its claim or defense sufficiently to warrant the court as a matter of law in directing judgment in its favor (CPLR 3212 [b]), and it must do so by tender of evidentiary proof in admissible form (*Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]). To defeat a summary judgment motion, the opposing party likewise must produce evidence in admissible form to

demonstrate the existence of a disputed material issue of fact sufficient to require a trial (*id.*; *see also* CPLR 3212 [b]).

A partial actual eviction occurs when the landlord wrongfully ousts the tenant from physical possession of a portion of the leased premises (*Barash v Pennsylvania Term. Real Estate Corp.*, 26 NY2d 77, 82-83 [1970]; *see also 524 W. End Ave. v Rawak*, 125 Misc 862 [1925]). It is certainly true that neither Hallmark nor SRM are in possession of the original storage space and that the space was converted into a parking facility, which Associates leased and delivered to MONY, and that the Hallmark Lease was never formally modified to reflect the exchange of storage space. However, the evidence in the record establishes that Hallmark acquiesced in the space substitution.

Jeff Mullen, an "area real estate and site development manager" responsible for the New York, New Jersey and Philadelphia areas for Hallmark Marketing Corporation, a sister corporation to defendant-respondent Hallmark Specialty Retail Group (both are subsidiaries of the same corporation), was informed about the space substitution by Mirsky on the very day SRM vacated the space. Despite this knowledge and being on the premises at the time, Mullen did not object, did not notify Hallmark, and took no action to stop the substitution. Although Mullen was not a direct employee of defendant-respondent Hallmark, his responsibilities included selecting sites for Hallmark stores and negotiating the leases for those stores. Although he testified that he appraised the site and the retailer (SRM), he did not negotiate the Hallmark Lease in question. There is no dispute that he was made aware that space covered by that Lease was given up in exchange for other space. Yet, his response was not to inform Hallmark headquarters of the substitution, but to ask Mirsky why he was making the exchange. Mullen accepted Mirsky's rationale—that he expected Associates to waive the rent increase that was due to be implemented in two years—thus evidencing Hallmark's acquiescence to the substitution. Because Hallmark, through Mullen, acquiesced in the substitution of space, it is precluded from protesting it in this litigation.

Based upon the evidence in the record, we conclude that the motion court erred in determining that Associates effected an actual partial eviction of Hallmark from its leasehold.

Accordingly, the motion court's order granting Hallmark and SRM summary judgment is reversed and Associates' motion for summary judgment is granted. Concur—Tom, J.P., Sullivan, Rosenberger and Friedman, JJ.